**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **MICHAEL KONTUR,** | ) | **CASE NO. 3:13CV1478** |
| | ) | |
| **Plaintiff,** | ) | **JUDGE JAMES G. CARR** |
| | ) | |
| **v.** | ) | **Magistrate Judge George J. Limbert** |
| | ) | |
| **CAROLYN W. COLVIN[1],** | ) | **REPORT AND RECOMMENDATION** |
| **ACTING COMMISSIONER OF** | ) | **OF MAGISTRATE JUDGE** |
| **SOCIAL SECURITY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

Michael Kontur ("Plaintiff"), seeks judicial review of the final decision of Carolyn W. Colvin ("Defendant"), Acting Commissioner of the Social Security Administration ("SSA"), denying his applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). ECF Dkt. #1. For the following reasons, the undersigned recommends that the Court REVERSE the ALJ's decision and REMAND the case to the ALJ for further analysis under the treating physician's rule and to reconsider his assessment of Plaintiff's credibility.

**I.** **PROCEDURAL AND FACTUAL HISTORY**

Plaintiff applied for DIB and SSI in April of 2010, alleging disability since October 1, 2009. ECF Dkt. #12 ("Tr.") at 134-144. The SSA denied Plaintiff's applications initially and on reconsideration. *Id.* at 65-97. Plaintiff requested an administrative hearing, and on October 18, 2011, an ALJ conducted an administrative hearing and accepted the testimony of Plaintiff and an impartial vocational expert ("VE"). Tr. at 31, 52. On November 1, 2011, the ALJ issued a decision denying benefits. Tr. at 11-23. Plaintiff appealed the decision, and on May 17, 2013, the Appeals Council denied review. Tr. at 1-7.

On July 9, 2013, Plaintiff filed the instant suit seeking review of the ALJ's decision. ECF Dkt. #1. On October 16, 2013, Plaintiff filed a brief on the merits. ECF Dkt. #13. On November 15,

---

[1]On February 14, 2013, Carolyn W. Colvin became the Acting Commissioner of Social Security, replacing Michael J. Astrue.

2013, Defendant filed a brief on the merits.  ECF Dkt. #14.  On November 20, 2013, Plaintiff filed a reply brief.  ECF Dkt. #15.

## II.    SUMMARY OF RELEVANT PORTIONS OF THE ALJ'S DECISION

The ALJ determined that Plaintiff suffered from carotid artery disease ("CAD"), peripheral arterial disease ("PAD"), coronary bypass grafting, fibromyalgia, carpal tunnel syndrome ("CTS"), cervical degenerative changes, bulging of the L5-S1 disc, osteoarthritis of the acromiclavicular joint, and back and leg pain, which qualified as severe impairments under 20 C.F.R. §404.1520(c) and 416.920(c).  Tr. at 13. The ALJ further determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, 20 C.F.R. §§ 404.1520(d), 404.1525 and 404.1526, 416.920(d), 416.925 and 416.926  ("Listings").  *Id*. at 14.

The ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. § 404.1567(b) and 416.967(b), except that he has a manipulation limitation of no more than frequent upper extremity bilateral handling or fingering.  Tr. at 14. The ALJ ultimately concluded that, although Plaintiff could not perform his past relevant work, there were jobs that existed in significant numbers in the national economy that Plaintiff can perform, including the representative occupations of inspector and hand packager, small product assembler and production assembler.  *Id*. at 22.  As a consequence, the ALJ found that Plaintiff had not been under a disability as defined in the SSA and was not entitled to benefits.

## III.    STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS

An ALJ must proceed through the required sequential steps for evaluating entitlement to benefits.  These steps are:

1.  An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b) and 416.920(b) (1992));

2.  An individual who does not have a "severe impairment" will not be found to be "disabled" (20 C.F.R. §§ 404.1520(c) and 416.920(c) (1992));

3.  If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see  20 C.F.R.  § 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made

without consideration of vocational factors (20 C.F.R. §§ 404.1520(d) and 416.920(d) (1992));

4.  If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e) and 416.920(e) (1992));

5.  If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. §§ 404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992).  The claimant has the burden to go forward with the evidence in the first four steps and the Commissioner has the burden in the fifth step.  *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

## IV.  STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability.  This Court's review of such a determination is limited in scope by §205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. §405(g).  Therefore, this Court's scope of review is limited to determining whether substantial evidence supports the findings of the Commissioner and whether the Commissioner applied the correct legal standards.  *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).

The substantial-evidence standard requires the Court to affirm the Commissioner's findings if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Cole v. Astrue*, 661 F.3d 931, 937, citing *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (citation omitted).  Substantial evidence is defined as "more than a scintilla of evidence but less than a preponderance."  *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234 (6th Cir. 2007).  Accordingly, when substantial evidence supports the ALJ's denial of benefits, that finding must be affirmed, even if a preponderance of the evidence exists in the record upon which the ALJ could have found plaintiff disabled.  The substantial evidence standard creates a "'zone of choice' within which [an ALJ] can act without the fear of court interference."  *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir.2001).  However, an ALJ's failure to follow agency

-3-

rules and regulations "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Cole, supra*, citing *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir.2009) (citations omitted).

## V.        RELEVANT MEDICAL HISTORY

On August 10, 1999, Plaintiff was admitted to the hospital after presenting with ischemic rest pain of the left foot. Tr. at 235. It was noted that Plaintiff was a heavy smoker of three packs of cigarettes per day. *Id*. at 235-236. Testing showed that Plaintiff had an occlusion of the approximal tibial vessels and a 10 centimeter occlusion of the proximal SFA. *Id.* at 235. Dr. Pigott performed a left superficial femoral endarterectomy with a Gore-Tec patch, left popliteal embolectomy with Gore-Tec patch and a completion arteriography. *Id*. at 235, 236.

On January 30, 2002, Dr. Pigott performed a right carotid endarterectomy with Hemashield patch for Plaintiff's right carotid stenosis with transient ischemic attack ("TIA"). Tr. at 233. He indicated that Plaintiff presented with a right hemispheric TIA and had greater than 90% carotid artery stenosis. *Id.*

On June 8, 2005, Dr. Pigott performed an aortography and left lower extremity runoff examination and bilateral iliac artery angioplasty and stenting for claudication of Plaintiff's left lower extremity. Tr. at 231. Dr. Pigott noted in his operative report that Plaintiff had vasculopathy and continued to smoke despite multiple warnings. *Id.*

On July 21, 2008, Dr. Pigott wrote a letter to Dr. Tausif, Plaintiff's primary physician, indicating that Plaintiff had undergone prior lower extremity intervention and right carotid endartecectomy and was doing well from those procedures. Tr. at 227. He noted Plaintiff's medications as Pravastatin, Cilostazol, Plavix and Lisinopril. *Id*. Physical examination revealed no carotid bruits and good femoral and distal pulses, and a vascular laboratory evaluation showed widely patent carotid arteries bilaterally. *Id*. Dr. Pigott also indicated that Plaintiff continued to smoke heavily and he recommended that Plaintiff follow up with him in one year. *Id.*

On December 19, 2008, Plaintiff underwent thoracic and cervical spine x-rays based upon his complaints of neck and back pain over the last several years. Tr. at 332. The x-rays showed

degenerative disc disease ("DDD") in the mid cervical spine with no bony neural foraminal narrowing and no abnormalities in the thoracic spine. *Id.* at 332-333.

On May 19, 2009, Plaintiff presented to the emergency room complaining or right knee pain over the last day. Tr. at 217. His upper and lower extremities presented normal ranges of motion except for his right knee which was tender to palpation and caused pain upon active range of motion. *Id*.at 218. X-rays showed no abnormality and the final diagnosis was knee pain with a rule out of a meniscus injury. *Id.* at 219. Plaintiff was advised to keep his knee wrapped and apply ice. *Id*. It was recommended that he follow up with an orthopedic specialist and obtain a MRI if the pain did not resolve completely. *Id.*

On June 16, 2009, Plaintiff had a chest x-ray performed which showed a left lower lobe infiltrate. Tr. at 329.

On June 29, 2009, Plaintiff underwent an arthroscopy with chondroplasty of the patella and medial femoral condyle and excision of a mass on the anterior right knee. Tr. at 322. Plaintiff had noticed a lump in his right knee for several years, with intermittent pain and swelling in the knee over the past several months. *Id*.

On July 16, 2009, Plaintiff presented to orthopedist Dr. Beeks for his complaints of upper and lower back pain, with hip and leg pain as well. Tr. at 246, 249, 281. Plaintiff reported that he had loaded trucks for ten years and he started feeling worse over the last three years. *Id.* It was noted that he had a significant history of low back pain since 1990. *Id*. at 249. Plaintiff reported that he had participated in physical therapy, had received chiropractic treatment, and had undergone epidural steroid injections without significant relief. *Id.* It was noted that Plaintiff was a two pack per day smoker "until a couple of months ago." *Id*. Physical examination revealed that Plaintiff had a normal gait, normal strength and reflexes, no significant tenderness to palpation in his back, but a trigger point at the upper cervicothoracic junction or upper thoracic spine. *Id.* Dr. Beeks reviewed a MRI of the lumbar spine which showed mild L4-L5 DDD and significant DDD at L5-S1, but no significant disc herniation, stenosis or nerve impingement. *Id.* Dr. Beeks ordered physical therapy and referred him to a rheumatologist. *Id*. at 250.

On July 20, 2009, x-rays of Plaintiff's cervical spine showed mild lower cervical degenerative changes.  Tr. at 225.

On July 27, 2009, Plaintiff underwent an arterial lower bilateral examination which showed a minimally diminished arterial brachial index on the right and mild to moderate arterial insufficiency with superficial femoral artery occlusive disease in the left.  Tr. at 224, 228-229.  A carotid/vertebral imaging showed some heterogeneous plaque on the right side with no evidence of atherosclerotic disease and atherosclerosis was noted on the left side without hemodynamically significant stenosis.  *Id.* at 230.

Dr. Pigott examined Plaintiff on July 27, 2009 for his CAD and PAD and found no carotid bruits and good femoral and distal pulses.  Tr. at 226.  Plaintiff indicated that he had stopped smoking three months ago.  *Id*.

On July 30, 2009, Plaintiff presented to Dr. Abusamieh,  a rheumatologist, for his complaints of back and neck pain, stiffness in his hands, fatigue and an inability to sleep well at night.  Tr. at 259.  Dr. Beeks had referred Plaintiff.  *Id.*  Plaintiff reported chronic lower back pain over the past ten years and tried physical therapy, injections and medications in the past with no relief.  *Id*.  Upon examination, Plaintiff's gait was normal and he had normal ranges of motion in his wrists and fingers, but had scattered Bouchard's nodes and Herberden's nodes.  *Id*. at 261.  His shoulders, elbows, hips, knees and ankles showed no tenderness and normal ranges of motion.  *Id*. at 261-262.  His cervical spine was normal in alignment but mildly restricted in range of motion and his thoracic spine was normal.  *Id.* at 262.  Plaintiff's lumbar spine had normal alignment, mild tenderness, and moderate restriction in ranges of motion.  *Id.*

Dr. Abusamieh concluded that Plaintiff's clinical presentation was consistent with fibromyalgia and he recommended physical exercise and the continuation of physical therapy, as well as a prescription for Neurontin.  Tr. at 262.  He diagnosed Plaintiff with fibromyalgia myalgia myositis, CTS, cervical spondylosis, lumbosacral spondylsosis without myelopathy, and low back pain.  *Id*.  He continued Plaintiff's medications of Percocet, St. Joseph Aspirin, Plavix, Zanaflex, Nexium, Lisinopril, Chantix and Claritin, and he added Neurontin amd told him to taper off of Percocet.  *Id*. at 262.

-6-

X-rays ordered by Dr. Abusamieh on July 30, 2009 showed no abnormalities in Plaintiff's hands or sacroiliac joints.  Tr. at 264.

On September 4, 2009, Plaintiff presented to Dr. Beeks for his complaints of right sided abdominal pain that traveled to his back.  Tr. at 248.  Plaintiff's active problems were listed as fibromyalgia, hyperlipidemia, hypertension and lower back pain.  *Id.*

On September 15, 2009, Plaintiff underwent a right upper quadrant ultrasound for his complaints of pain and the results showed no abnormalities of his gallbladder, but fatty infiltration of the liver.  Tr. at 307.  He also underwent an upper gastrointestinal examination which showed a small hiatal hernia with several episodes of gastroesopageal reflux and a probable shallow ulcer in the duodenum without evidence of outlet obstruction.  *Id.* at 309, 482.

On September 24, 2009, Plaintiff completed his eleventh of twelve aquatic physical therapy sessions and he was discharged because no relief was received with the therapy.  Tr. at 238.  It was noted that Plaintiff's rheumatologist had diagnosed him with fibromyalgia.  *Id.*

On September 29, 2009, Dr. Beeks noted that Plaintiff returned to the office and reported that he had been diagnosed with fibromyalgia by a rheumatologist.  Tr. at 247, 279.  Dr. Beeks also noted that Plaintiff received no clear benefit from physical therapy.  *Id.*  Plaintiff indicated that he still suffered sharp back pain with radiation into his legs, with some achy pain and bilateral burning pain in his arms with his hands that woke him up two to three times in the middle of the night.  *Id.*  Upon examination, Dr. Beeks found a positive Phalen's sign for pain, although not as traditional carpal tunnel description as he expected.  *Id.*  He also found that Plaintiff's strength was normal.  *Id.*  His impression was noctural dysesthesias consistent with CTS and he ordered an EMG of Plaintiff's bilateral upper extremities.  *Id.*

On September 30, 2009, Plaintiff followed up with Dr. Abusamieh for his fibromyalgia.  Tr. at 255.  Plaintiff complained of widespread aches and pain, along with fatigue and a particularly painful back.  *Id.*  Plaintiff reported no major response while on Gabapentin and he stopped physical therapy because it made him feel worse.  *Id.*  Upon examination, Dr. Abusamieh found that Plaintiff had a normal gait and normal ranges of motion in his wrists and fingers, but he had scattered Bouchard's nodes and Herberden's nodes.  *Id.* at 257.  His shoulders, elbows, hips and knees showed

-7-

no tenderness and normal ranges of motion. *Id.* Plaintiff also had moderately severe myofascial pain with 12/18 tender points as defined by the American College of Rheumatology ("ACR"). *Id.* Dr. Abusamieh diagnosed CTS, cervical spondylosis, lumbosacral spondylsosis without myelopathy, low back pain, and fibromyalgia myalgia myositis. *Id.* He continued Plaintiff's medications of Plavix, Zanaflex, Nexium, Lisinopril, Pravastatin Sodium, and Gabapentin, and he increased the Neurontin dosage and added Savella. *Id.* at 258. He noted Plaintiff's status as stable but indicated that his fibromyalgia needed further control and Plaintiff needed to regularly exercise. *Id.*

On October 6, 2009, Plaintiff presented to Dr. Pierce, his new primary care physician, for follow up of his pain, fatigue and inability to sleep at night. Tr. at 274. Plaintiff reported that he had pain all over and he had been diagnosed with fibromyalgia. *Id.* Upon examination, Dr. Pierce found that Plaintiff had a normal gait, normal ranges of motion in all extremities and normal strength and

muscle tone. *Id.* at 275. He found that Plaintiff's carotid pulses were normal with no bruits and no peripheral edema. *Id.* He increased Plaintiff's Neurtonin and Lisinopril, encouraged Plaintiff to stop smoking and told him to avoid narcotics because he had fibromyalgia. *Id.* at 27.

On October 14, 2009, Plaintiff underwent an EMG/nerve conduction study of the bilateral upper extremities for his two year history of worsening numbness, tingling and weakness in his hands and fingers and neck pain. Tr. at 242, 282, 286. The EMG showed CTS bilaterally greater on the right, with denervation changes of the ulnar nerves and the approaching criteria for demyelinative peripheral neuropathy. *Id.*

On November 17, 2009, Dr. Beeks examined Plaintiff for his fibromyalgia and reviewed his upper extremity EMG which showed mild and not severe CTS. Tr. at 245. He diagnosed Plaintiff with fibromyalgia, multiregional pain and pain consitent with CTS, although not as pure as he would like to have seen. *Id.* He ordered a trial of wrist splints for Plaintiff. *Id.*

On November 30, 2009, Plaintiff presented to Dr. Abusamieh for a follow up evaluation of his fibromyalgia. Tr. at 251. Plaintiff continued to complain of widespread pain and stiffness in his shoulders, lower back, and lower extremities. *Id.* He complained of fatigue and being tired and reported that he was compliant with his medications but they were not helping. *Id.* Physical

examination revealed no joint swelling or effusion and no fever, chills or rash. *Id.* It was noted that Plaintiff had stopped smoking cigarettes recently. *Id.* Upon examination, Plaintiff's gait was normal and he had normal range of motion in his wrists and fingers, but had scattered Bouchard's nodes and Herberden's nodes. *Id*. at 252. His shoulders, elbows, hips and knees showed no tenderness and normal ranges of motion. *Id*. at 252-253. His cervical spine was mildly restricted in range of motion and his lumbar spine had moderate tenderness and mild restriction in range of motion. *Id.* at 253. Plaintiff also had moderately severe myofascial pain with 12/18 defined American College of Rheumatology tender points. *Id.* Dr. Abusamieh diagnosed CTS, cervical spondylosis, lumbosacral spondylsosis without myelopathy, low back pain, and fibromyalgia myalgia myositis. *Id*. He continued Plaintiff's medications of Plavix, Zanaflex, Nexium, Savella, Lisinopril, Gabapentin, and Simvastatin, and added Trazodone and Desyrel. *Id*. at 251, 253. He noted Plaintiff's status as stable but indicated that his fibromyalgia needed further control. *Id*. at 253.

On January 19, 2010, Plaintiff presented to Dr. Pierce complaining of lower back and hip pain and a difficult time sleeping. Tr. at 270. Plaintiff reported that his pain had been severe since Christmas and he stopped taking Neurontin and Savella on his own. *Id.* He further noted that he had treated with his rheumatologist the week prior and he was referred to a pain clinic but could not get in until February. *Id*. Upon examination, Dr. Pierce found that Plaintiff had a normal gait, normal range of motion in all extremities, and normal strength and muscle tone. *Id.* at 271. He diagnosed an acute duodenal ulcer, fibromyalgia and esophageal reflux. *Id.* He discontinued Plaintiff's Gabapentin and Savella, prescribed Oxycodone-Acetaminophen, and told Plaintiff to hold off taking Simvastatin and use Percocet only in the short-term for pain. *Id*.

On January 28, 2010, Plaintiff presented to Dr. Beeks for follow up, complaining about his right CTS and indicating that the wrist splints had not provided significant relief. Tr. at 277, 342. Upon examination, Dr. Beeks had a positive Tinel's sign at the elbow, but carpal tunnel symptoms were difficulty to obtain. *Id*. Dr. Beeks diagnosed Plaintiff with fibromyalgia, multiregional pain, and an EMG and symptoms consistent with CTS. *Id.* Dr. Beeks opined that while he did not think that CTS fully explained Plaintiff's pain, there was a sixty percent chance of relieving the pain with

-9-

surgical intervention. *Id*. He noted that Plaintiff wanted to think about surgery and they would discuss it as their next visit. *Id*.

On February 2, 2010, Plaintiff had a MRI of the lumbar spine which was compared to his July 30, 2008 MRI and showed no changes in vertebral body heights or at T12-L1 or L3-L4. Tr. at 288. The MRI results also showed no change in the minimal bulging at L4-L5 with mild facet hypertrophy. *Id*. However, at L5-S1, there was moderate diffuse bulging, greater on the left, and a possible minimal annular tear in the midline with slightly greater protrusion than before which was categorized as a subtle change at best. *Id*. The MRI also showed mild encroachment upon the L5-S1 foramina by bulging disc/osteophytes, left greater than right. *Id*.

On February 22, 2010, Plaintiff presented to Dr. Pierce for follow up as to his cholesterol medications. Tr. at 551. Plaintiff indicated that he was not having chest pain or shortness of breath and he could not afford to go to a pain clinic for his back pain. *Id*. He reported that he was running out of insurance coverage. *Id*. Physical examination revealed normal results and Dr. Pierce diagnosed Plaintiff with fibromyalgia, esophageal reflux, hyperlipidemia and hypertension. *Id.* at 552. Plaintiff's Percocet was increased and he was told to restart Simvastatin. *Id*.

Dr. Pierce referred Plaintiff to CPWRehab for a functional capacity evaluation that occurred on February 25 and 26, 2010. Tr. at 291. On March 2, 2010, the therapists who conducted the evaluation issued a report concluding that Plaintiff was limited by pain and fatigue to a functional level that would be categorized as "Below Sedentary." *Id*. at 297. They explained that Plaintiff relied on narcotic medications during the day and at night, as well as a muscle relaxant and they opined that due to this, as well as the multiple areas of involvement from Plaintiff's CTS, cervical spine, thoracic spine, lumbar spine, hips, right knee, legs, left shoulder and arm pain, they were unsure that he could tolerate consistent work in any capacity. *Id*. The therapists concluded that Plaintiff had poor tolerance to long duration sitting and standing and had difficulty walking for a distance. *Id.* They opined that unless additional medical intervention could improve his symptoms and functional ability, he was a candidate for permanent disability. *Id.*

On March 15, 2010, Plaintiff presented to the emergency room complaining that after he sneezed the night prior, he had the sudden onset of right mid back pain. Tr. at 298. Physical

-10-

examination revealed that Plaintiff had a steady gait and could ambulate normally, but was in pain and had tenderness to the right side of his back.  *Id.* at 299.  Plaintiff rated the back pain as a 10 of 10 and denied numbness and had no motor weakness or bladder or bowel incontinence.  *Id.*  Scattered wheezing was present with paraspinal tenderness in the back.  *Id.*  He was given medication and was discharged with a diagnosis of right throcolumbar strain and spasm.  *Id.* at 301.

On March 31, 2010, Plaintiff presented to Dr. Pierce complaining of back pain and pain over the right ribs.  Tr. at 543.  Dr. Pierce reviewed Plaintiff's MRI and functional capacity evaluation and they discussed filing for disability and the option of neurosurgery, of which Plaintiff refused the latter.  *Id.* at 544.  Physical examination revealed normal results and Dr. Pierce diagnosed lower back pain, hypertension and acute duodenal ulcer.  *Id.*

On April 22, 2010, Dr. Pierce wrote a letter "To Whom it May Concern" indicating that Plaintiff had a chronic back pain diagnosis and was unable to work due to pain.  Tr. at 336.  He further opined that Plaintiff would be off of work for a duration minimum of one year.  *Id.*

On May 11, 2010, Dr. Pierce indicated that Plaintiff came in so he could fill out disability paperwork.  Tr. at 541.  Plaintiff complained of hand tingling, significant back pain and he had limited range of motion in his spine.  *Id.*  Physical examination revealed normal results and Plaintiff was diagnosed with fibromyalgia, hypertension and low back pain.  *Id.* at 542.  He was prescribed Oxycodone-Acetaminophen, Trazodone and Zanaflex.  *Id.* at 542.  Dr. Pierce indicated that he completed Plaintiff's paperwork and he encouraged Plaintiff to reconsider CTS surgery.  *Id.*

The record contains a medical evaluation form completed by Dr. Pierce indicating that he first saw Plaintiff on September 4, 2009 and last saw him on May 11, 2010.  Tr. at 285.  Dr. Pierce listed the diagnoses for Plaintiff as fibromyalgia and lower back pain and noted that Plaintiff had stiffness and numbness in his hands, a CTS diagnosis, and severe low back pain with a DDD diagnosis.  Tr. at 285.  He also noted that Plaintiff had limited range of motion in his spine and no surgery was planned, but Plaintiff was to continue taking pain medications.  *Id.*

On June 15, 2010, Dr. Pierce completed a discharge application for Plaintiff's student loans based upon total and permanent disability.  Tr. at 485.  He listed Plaintiff's disabling conditions as as CTS, fibromyalgia, low back pain carotid atherosclerosis and PAD.  *Id.*  When asked to describe

-11-

the severity of the disabling medical condition, Dr. Pierce stated that Plaintiff had disabling chronic back pain.  *Id*.  He then listed Plaintiff's limitations as his inability to walk except for a short distance, Plaintiff's ability to stand and sit for only a short period of time and his inability to lift objects.  *Id*.  Dr. Pierce also wrote that Plaintiff's daily activities are limited in that he could not perform yard work, stand for only a short time, was unable to use stairs, had a hard time driving and showering and putting on his socks.  *Id*.  Under a section titled "[r]esidual functionality," Dr. Pierce wrote that Plaintiff had hand numbness if driving and tingling in his hands.  *Id*.  Under a section titled "'[s]ocial/behavioral limitations," Dr. Pierce wrote that Plaintiff was unable to attend his children's sporting events as he was unable to sit in the bleachers.  *Id*.

The record also contains another medical evaluation form Dr. Pierce.  Tr. at 337, 347.  Dr. Pierce indicated that he first saw Plaintiff on September 4, 2009 and last saw him on September 7, 2010.  Tr. at 337.  He listed Plaintiff's diagnoses as fibromyalgia, CTS and low back pain.  *Id*.  He described Plaintiff's symptoms as pain in his feet and muscle spasms in his hands and arms which began in 2000.  *Id*.   He noted that Plaintiff had a positive Tinel's sign and indicated that carpal tunnel surgery was necessary as well as a possible cervical disc surgery.  *Id*. He also indicated that Plaintiff took Percocet with minimal effectiveness and he had a poor response to medication.  *Id*. at 337-338.  He listed Plaintiff's limitations as needing help getting dressed and putting his socks on and  difficulties bending or stooping due to his back pain.  *Id.* at 338.

On September 7, 2010, Plaintiff presented to Dr. Pierce to obtain his disability paperwork.  Tr. at 344.  Plaintiff reported that Dr. Breeks had recommended surgery.  *Id*.  Physical examination by Dr. Pierce revealed normal results, including a normal gait, normal ranges of motion in all extremities and normal muscle strength and tone.  *Id*. at 345.

On September 27, 2010, Plaintiff presented to Dr. Pierce complaining of right ear pain and chest pain with pain in both arms.  Tr. at 539.  Physical examination showed normal results and he was prescribed Nasonex and Nexium and told that the only way to rule out angina is a stress test.  *Id*. at 540.  Plaintiff indicated he had no insurance and could consider a stress test.  *Id*.

Plaintiff underwent a psychological evaluation at the request of the agency on September 30, 2010.  Tr. at 354.  Plaintiff drove himself to the evaluation and related that he last worked in 2005

-12-

in a steel plant and was laid off after working there for three years.  *Id*. at 356.  He indicated that he was a "great worker" and his physical impairments prevented him working, not any psychological impairment.  *Id*.  He described his mood over the past week as "terrible physically, irritable."  *Id*. at 357.  He reported loss of energy or persistence and difficulty falling asleep.  *Id*.  He indicated that he was irritable due to his physical limitations.  *Id*.  He reported that he continued to enjoy bug collecting with his girlfriend's son and chasing storms and he even posted a tornado video on YouTube.  *Id*.  He was living with his girlfriend and her children and he was responsible for cleaning and grocery shopping.  *Id*. at 359.  Plaintiff's cognitive skills were estimated to be average in range. *Id*. at 358.  Dr. Kelly diagnosed no psychological disorders and opined that Plaintiff was unimpaired in relating to others, understanding, remembering and following directions, maintaining attention and concentration, or in withstanding the stress and pressures of daily work activity.  *Id*. at 361.

On October 7, 2010, Plaintiff presented to the emergency room complaining of sharp low back and hip pain with radiation, explaining that he bent over to pick something up a day prior and felt pain which worsened over the last day.  Tr. at 375.  He was able to ambulate normally and had a steady gait and no numbness, motor weakness or incontinence.  *Id*. at 376.  No abnormalities were found upon physical examination.  *Id*. at 376-377.  He was injected with pain medication and diagnosed with lumbar strain.  *Id*. at 378.

On October 11, 2010, Plaintiff presented to Dr. Pierce for follow up of his lower back pain. Tr. at 537.  Plaintiff reported that he had pulled his back out five days prior and had pain with radiation into the right buttock.  *Id*.  Physical examination of Plaintiff yielded normal results and he was diagnosed with hypertension and lower back pain.  *Id*. at 538.  He was prescribed Oycodone-Acetominophen, Hydrochlorothizide and Lisinopril at the visit.  *Id*.

On the same date, Dr. Pierce completed a medical form for the Lucas County Department of Job and Family Services.  Tr. at 486.  He described Plaintiff's medical conditions as fibromyalgia, CAD and low back pain.  *Id*.  He noted that Plaintiff's prognosis was fair and his health status was poor but stable.  *Id*.  He opined that Plaintiff could stand/walk up to thirty minutes per eight-hour workday  for twenty to thirty minutes without interruption and he could sit up to twenty to thirty minutes per eight-hour work day for twenty to thirty minutes without interruption.  *Id*. at 487.  Dr.

-13-

Pierce further opined that Plaintiff could frequently lift and carry from up to six to ten pounds and he was extremely limited in pushing/pulling, reaching, handling, repetitive foot movements, and in hearing.  *Id*.  Dr. Pierce opined that Plaintiff was unemployable and he found Plaintiff to be permanently disabled since 2005.  *Id*.

On October 13, 2010, Plaintiff underwent a persantine myocardial perfusion stress/rest scintigraphy which showed a modest sized inferoseptal photopenia with hypokinetic wall motion which suggested a possible prior endocardial/nontransmural infarction, but no evidence of ischemia. Tr. at 373.

On November 4, 2010, Dr. Katz completed a psychiatric review technique form and a mental RFC form upon review of Plaintiff's records at the agency's request.  Tr. at 379.  She found no medically determinable impairment and therefore found no restrictions on Plaintiff's functional limitations based on a mental impairment.  *Id*. at 379-389.

On November 8, 2010, Dr. Kylop reviewed Plaintiff's records at the request of the agency and agreed with the original RFC of June 14, 2010 as he found Plaintiff's credibility only partially credible because he had a normal non-antalgic gait throughout the medical examinations, with normal movements and muscle strength and was not physically uncomfortable during the psychological evaluation. Tr. at 393.  He indicated that he gave no weight to Dr. Pierce's statements that Plaintiff was disabled because this is a decision left to the Commissioner.  *Id*.

On November 10, 2010, Plaintiff presented to Dr. Adusumilli, a cardiologist, for an evaluation upon referral by Dr. Pierce.  Tr. at 394.  He wrote Dr. Pierce a letter reviewing Plaintiff's history of CAD, his carotid endarterectomy, peripheral vascular disease ("PVD") with bilateral claudication and status post left leg stent, hyperlipidemia, chronic tobacco use, hypertension and reflux disease.  *Id*.  He cited Plaintiff's reports that since August of 2010, Plaintiff had reported intermittent mid substernal chest pressure lasting five minutes at a time with dizziness, both arms hurting at the same time, palpitation and shortness of breath.  *Id*.  He noted Plaintiff's abnormal stress tests and an EKG performed on October 14, 2010 which showed frequent PACs, occasional supraventricular couplet, non-specific, St-T wave abnormality and early transition abnormal EKG. *Id*.  Plaintiff's current diagnoses included angina pectoris, arrhythmia-PACs, PVD, abnormal

-14-

persatine nuclear study showing a moderate inferoseptal infarct with no ischemia, carotid artery stenosis, hyperlipidemia, tobacco abuse, hypertension, abnormal EKG and reflux disease. *Id.* Dr. Adusmilli's plan was to continue Plaintiff's current medications, start Plaintiff on Ecotrin and Nitroglycerin, and he recommended a cardiac catherization to rule out underlying critical revascularizable CAD. *Id.* at 395. Plaintiff was instructed to stop smoking and to follow a diet, and the doctor suggested a 2D ECG and a 24-hour Holter monitor. *Id.*

On November 16, 2010, Plaintiff underwent a cardiac catheterization performed by Dr. Upamaka and the procedure revealed severe CAD, so Plaintiff underwent an emergency coronary artery bypass grafting ("CABG") on November 17, 2010 and was discharged from the hospital on November 23, 2010. Tr. at 401, 489. Dr. Upamaka's letter to Dr. Pierce explained that Plaintiff had high grade ostial left main stenosis with the dampening of the pressures when the left main coronary artery was engaged and also a proximal LAD stenosis of 80-90% and proximal RFC stenosis. *Id.* He advised Dr. Pierce that Plaintiff was going to undergo urgent CABG. *Id.* at 502.

On November 23, 2010, Dr. Moront wrote a letter to Dr. Pierce indicating that Plaintiff was discharged on November 23, 2010 after undergoing coronary artery bypass grafting X3. Tr. at 489.

On November 26, 2010, Plaintiff presented to the emergency room complaining of left shoulder pain. Tr. at 363. He indicated that he had undergone a coronary bypass grafting on November 17, 2010, was discharged on November 23, 2010, and had pain without relief from Percocet since the surgery. *Id.* Chest x-rays showed an acute infiltrate/atelectasis in the left lung base with a small left pleural effusion and upper extremities x-rays showed degenerative joint disease and a left shoulder x-ray showed moderate degenerative narrowing of the acromioclavicular joint.

*Id* at 365-366. He was given Dilaudid and released. *Id.* at 365.

On December 1, 2010, Plaintiff presented to Dr. Pierce complaining of severe pain in his lower lumbar region and in his left periscapular region. Tr. at 535. He had no chest pain but reported that he was taking 9 Percocets per day without relief. *Id.* Physical examination revealed normal results and Plaintiff was diagnosed with CAD, hyperlipidemia, lower back pain and atrial fibrillation. *Id.* at 534-536. Dr. Pierce prescribed Morphine. *Id.* at 536.

-15-

On December 2, 2010, Dr. Adusumilli examined Plaintiff for his complaints of pain all over with back and shoulder pain.  Tr. at 500.  Plaintiff reported that he had difficulty moving his extremities.  *Id.*  He indicated that he had no chest pain.  *Id.*  Dr. Adusumilli indicated that Plaintiff was doing well and while he had referred Plaintiff for cardiac rehabilitation, Plaintiff did not have insurance coverage for it.  *Id.* at 501.  Plaintiff reported that he had stopped smoking.  *Id.*

On December 14, 2010, Dr. Moront, a cardiothoracic surgeon, wrote a letter to Dr. Pierce indicating that he had seen Plaintiff for follow up from his emergency CABG and he was doing quite well.  Tr. at 488.  Dr. Moront indicated that Plaintiff's activity level was excellent and his appetite was good but he was having trouble sleeping.  *Id.*  He commented that he was quite pleased with Plaintiff's early postoperative course and he surmised that Plaintiff would have a good result from his surgery.  *Id.*

On December 28, 2010, Dr. Adusumilli evaluated Plaintiff for his post cardiac catheterization and CAGB.  Tr. at 495.  He listed Plaintiff's diagnoses as CAD, hyperlipidemia, hypertension, PVD, reflux disease, and coronary artery stenosis, and status post right carotid endarterectomy.  *Id.*  Dr. Adusumilli indicated that Plaintiff's left pericardial area burning and pain appeared to be musculoskeletal in nature.  *Id.*  Plaintiff reported that he had stopped smoking and was taking his medications regularly.  *Id.*  Dr. Adusumilli commented that Plaintiff was stable overall and doing well post CABG.  *Id.* at 396.  He continued Plaintiff on all of his medications and referred him for cardiac rehabilitation.  *Id.*

On February 7, 2011, Plaintiff presented to Dr. Pierce complaining of shortness of breath and left-sided chest pain with nausea.  Tr. at 533.  His blood pressure was elevated, but the rest of the clinical examination showed normal results.  *Id.* at 533-534.  Dr. Pierce ordered an EKG which showed an inferior infarction of an undetermined age.  *Id.* at 508. He also underwent a chest x-ray and a left lower lobe infiltration was found with a small amount of left-sided effusion.  *Id.* at 491.  Scarring was noted at the left lung base and a small hiatal hernia was noted.  *Id.* at 492. Dr. Pierce diagnosed CAD and summoned an ambulance to take Plaintiff to the hospital because Plaintiff indicated that the chest pain became more intense and went down his left shoulder and into his left arm.  *Id.* at 534, 572.

-16-

Plaintiff was admitted to the hospital on February 7, 2011 for his chest pain and elevated blood pressure. Tr. at 556, 560. The hospital notes revealed negative cardiac enzymes and no acute changes on an EKG and no evidence of pericardial effusion or deep vein thrombosis. *Id.* at 556, 574. He was given aspirin and three nitroglycerin tables. *Id.* at 572. He was discharged on February 8, 2011 with atypical chest pain, CAD, hypertension, hyperlipidemia, left lung infiltrate versus atelectasis and recent CABG, and he was told to remain on his present cardiac medications. *Id.* He was also advised to follow up with Dr. Adusumilli. *Id.*

On February 25, 2011, Plaintiff presented to Dr. Adusumilli for follow up of his unspecified chest pain and CAD. Tr. at 497. He noted that Dr. Pierce had evaluated Plaintiff on February 25, 2011 and admitted him to the hospital where myocardial infarction was ruled out and it was believed that Plaintiff had musculoskeletal chest wall pain. *Id.* Plaintiff reported body aches, arm throbbing, and shortness of breath. *Id.* An EKG showed normal sinus rhythm, left atrial enlargement, incomplete right bundle-branch block and a ST-T wave abnormality suggestive of inferolateral wall ischemia. *Id.* Dr. Adusumilli offered another cardiac catherization which Plaintiff refused, so he was started on Imur and Lisinopril and a CT angiogram of the coronary arteries to rule out any graft occlusive disease. *Id.* at 498.

On March 29, 2011, Plaintiff presented to Dr. Pierce complaining of his hands and legs going numb, mainly over the top of his legs. Tr. at 529. Clinical examination revealed normal results and Plaintiff was diagnosed with fibromyalgia, hypertension, CTS, arterial insufficiency, and lower back pain. *Id.* at 530. He ordered blood testing and recommended that Plaintiff undergo an EMG of his legs and see a vascular specialist for the occlusions in his legs. *Id.*

On March 31, 2011, Plaintiff presented to Dr. Adusumilli for follow up of his conditions. Tr. at 493. Plaintiff complained of chest soreness and burning, as well as fatigue. *Id.* Plaintiff reported that he had not been smoking. *Id.* Clinical examination revealed diaphoresis, dyspnea, muscle pain and cramps, and anxiety. *Id.* Dr. Adusumilli indicated that Plaintiff had normal LV systolic function on a CT angiogram of his coronary arteries, only 30% distal right CAD, and Plaintiff's hypertention was well-controlled. *Id.* at 494. He recommended that Plaintiff continue

-17-

his medications except for Imur since Plantiff indicated that it made no difference in his symptoms. *Id*.

On May 5, 2011, Plaintiff underwent an EMG/nerve conduction study for his complaints of numbness and tingling in the right lateral thigh and chronic low back pain and right hip pain. Tr. at 503. Physical examination revealed decreased sensation on the right lateral thigh to touch, equal reflexes and strength, pain with straight leg raising, limited range of motion of the lumbosacral spine and tenderness of the lumbosacral paravertebral muscles. *Id*. Plaintiff was able to heel and toe walk but had difficulty squatting. *Id*. The testing was incomplete because Plaintiff deferred part of the test, but the physician felt that the testing argued against a significant peripheral neuropathy or radiculopathy, although he could not fully rule out a possible right lateral femoral cutaneous neuropathy. *Id*. at 504.

On May 20, 2011, Plaintiff presented to Dr. Pierce complaining that he was still having severe pain and the Morphine prescribed was not helping. Tr. at 527. It was noted that Plaintiff could not go to a pain management clinic because he had no insurance. *Id*. Physical examination showed no respiratory distress, normal heart rate and rhythm, and Plaintiff had a normal gait, normal movement in all extremities and normal muscle strength and tone. *Id.* at 528. Dr. Pierce diagnosed fibromyalgia and hypertension and prescribed Oxycodone-Acetaminphen and discontinued the Morphine. *Id.* He also changed Plaintiff's medication back to Percocet and advised going to pain management. *Id*.

On June 23, 2011, Dr. Pierce penned a letter addressed "To Whom It May Concern" indicating that Plaintiff had a diagnosis of chronic back pain and he was unable to work due to pain and would be off of work for a duration of one year minimum. Tr. at 526.

On August 19, 2011, Plaintiff presented to Dr. Pigott for his CAD and PAD. Tr. at 588. Dr. Pigott indicated that Plaintiff had stopped smoking and "is really doing quite well." *Id.* Upon examination, Dr. Pigott noted that Plaintiff was neurologically asymptomatic, but had some claudication in his left leg. *Id*. He found no carotid bruits, intact femoral pulses but absent left pedal pulses. *Id*. A recent vascular lab evaluation showed mild plaque along both of Plaintiff's internal carotid arteries. *Id*. Plaintiff was told to follow up in one year. *Id.*

-18-

On August 23, 2011, Plaintiff presented to Dr. Beeks for follow up of his multiple complaints. Tr. at 586. Plaintiff reported that he had been trying for five years to get social security disability benefits. *Id*. He indicated that his biggest complaint was numbness and tingling and he had mild Phalen's sign at 45 seconds upon physical examination. *Id.* Dr. Beeks indicated that Plaintiff had an EMG which showed some moderate bilateral CTS. *Id*. He diagnosed fibromyalgia, multiregional pain, and pain consistent with bilateral CTS, as well as an EMG consistent with bilateral CTS. *Id*. He found that Plaintiff was a candidate for carpal tunnel release. *Id*.

On August 31, 2011, Plaintiff underwent a right carpal tunnel release for his right CTS. Tr. at 583. He returned to Dr. Beeks on September 13, 2011 for follow up and reported relief of numbness and tingling in his fingers. *Id.* at 585. He reported increasing symptoms in his left hand due to compensation for the inability to use the right hand. *Id*.

## VI.    HEARING TESTIMONY

Plaintiff was 49 years old at the time of the hearing. Tr. at 36. He testified that he has a driver's license but has trouble driving because his hands go numb and his back hurts. *Id.* at 36-37. He opined that he could drive for ten minutes. *Id.* at 36. He last worked from 2002 to 2005 running a slitter machine at Flat Rock Metal Processing. *Id*. at 37.

Plaintiff reported that he chose his disability date as October 1, 2009 because that is when he was diagnosed with fibromyalgia and his back and legs hurt so much that he could hardly walk and he still could not walk at the present time. Tr. at 39. He testified that his fibromyalgia, DDD, CTS, PAD, arthritis in his hands and neck, and spurs in his shoulders prevented him from working. *Id.* He reported that he could not sit or stand for more than twenty minutes at a time, his hands were not very functional, he does not sleep well at night and he has a hard time walking. *Id*. at 39-40. He related that he was scheduled for left carpal tunnel release surgery three days from the date of the hearing. *Id*. at 40. He also testified that prescribed medication helped him to sleep and Percocet lessened his pain but did not eliminate it. *Id*. at 41.

Plaintiff indicated that he was seeing only his primary care physician Dr. Pierce because that is the only doctor that he could afford to see and he last saw him three months ago. Tr. at 41. He explained that he was still supposed to be treating with his rheumatologist, but could not afford to

-19-

do so, but Dr. Pierce received reports from Plaintiff's specialists. *Id.* at 44.  He stated that he could walk not even a block because his leg becomes fatigued and he could not stand for more than ten to twenty minutes before he has to sit down or lie flat on the floor due to back pain. *Id.* at 41-42. He then has to sit, which he could do for twenty minutes. *Id.* at 42.  He testified that he does a little bit of cooking and had to give up hobbies such as collecting insects and playing harmonica in public performances due to his impairments. *Id.* at 43.  He also reported that he has trouble washing his hair because it hurts to hold his arms up that high and he uses a brush to wash his lower body. *Id.*

Upon questioning from his attorney, Plaintiff indicated that he did not have chest pains anymore. Tr. at 44.  He also reported that he always sits in his recliner so that he could lean it back and he had to keep his feet up after walking for a block to help with circulation. *Id.* at 45.  When asked about his back pain and whether it emanated from his DDD or fibromyalgia, Plaintiff believed that it came from the DDD because his legs go numb from it as well. *Id.* at 46.

The VE then testified.  Tr. at 46.  The ALJ presented the VE with a hypothetical individual who had the age, education and work experience as Plaintiff, with a RFC for light work with the manipulative limitation of no more than frequent upper extremity bilateral handling or fingering. *Id.* at 47.  When asked if such a person could perform Plaintiff's past relevant work, the VE responded that such an individual could not. *Id.*  When asked whether such a hypothetical individual could perform other work in the national economy, the VE responded that such a person could perform the representative occupations of an inspector and hand packager, small products assembler, or a production assembler. *Id.* at 48.

In his second hypothetical individual presented to the VE, the ALJ assumed the same hypothetical person as the first, except with a RFC for sedentary work with the manipulative limitations of no more than occasional upper extremity bilateral handling or fingering. Tr. at 48. The VE responded that such a person could not perform any work in the national economy. *Id.*  The VE also indicated that competitive employment employers generally require that employees be on task at least 80% throughout the workday and not miss more than one day per month beyond any sick time or vacation time allotted. *Id.*

## VII.    LAW AND ANALYSIS

### A.    TREATING PHYSICIAN RULE

Plaintiff first argues that the ALJ failed to properly weigh the medical opinions because he gave controlling weight to the opinions of non-examining and non-treating agency physicians.  The undersigned recommends that the Court find that this assertion is without merit because the ALJ did not give controlling weight to the non-examining and non-treating agency opinions.  The ALJ first discussed the opinions of the treating physicians and thereafter clearly stated that he gave great weight, not controlling weight, to the opinions of the non-examining and non-treating medical sources.  Tr. at 21.

However, Plaintiff also argues that the ALJ failed to properly apply the treating physician rule in attributing less weight to the opinions of Dr. Pierce, his treating physician.  The undersigned recommends that the Court find merit to this assertion and remand this case for the ALJ to reevaluate the treating medical opinions and analyze these opinions with proper articulation and application of the treating physician rule.

An ALJ must adhere to certain standards when reviewing medical evidence in support of a claim for social security.  Most importantly, the ALJ must generally give greater deference to the opinions of the claimant's treating physicians than to those of non-treating physicians.  SSR 96-2p, 1996 WL 374188 (July 2, 1996); *Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 544 (6th Cir. 2004).  A presumption exists that the opinion of a treating physician is entitled to great deference.  *Id.*; *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 243 (6th Cir. 2007).  If  that presumption is not rebutted, the ALJ must afford controlling weight to the opinion of the treating physician if that opinion regarding the nature and severity of a claimant's conditions is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record." *Wilson,* 378 F.3d at 544.  When an ALJ determines that a treating physician's opinion is not entitled to controlling weight, he must consider the following factors in determining the weight to give to that opinion:  the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors.  *Id.*

If an ALJ decides to discount or reject a treating physician's opinion, he must provide "good reasons" for doing so.  SSR 96-2p.  The ALJ must provide reasons that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.*  This allows a claimant to understand how his case is determined, especially when he knows that his treating physician has deemed him disabled and he may therefore " 'be bewildered when told by an administrative bureaucracy that he is not, unless some reason for the agency's decision is supplied.' " *Wilson,* 378 F.3d at 544 quoting *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir.1999).  Further, it "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Id.* If an ALJ fails to explain why he rejected or discounted the opinions and how those reasons affected the weight accorded the opinions, this Court must find that substantial evidence is lacking, "even where the conclusion of the ALJ may be justified based upon the record." *Rogers,* 486 F.3d at 243, citing *Wilson*, 378 F.3d at 544.

The Sixth Circuit has noted that, "while it is true that a lack of compatibility with other record evidence is germane to the weight of a treating physician's opinion, an ALJ cannot simply invoke the criteria set forth in the regulations if doing so would not be 'sufficiently specific' to meet the goals of the 'good reason' rule." *Friend v. Commissioner of Soc. Sec.*, No. 09-3889, 2010 WL 1725066, at *8 (6th Cir. Apr.28, 2010). For example, where an ALJ failed to describe "the objective findings that were at issue or their inconsistency with the treating physician opinions," remand has been ordered. *Barrett v. Astrue*, 2011 WL 6009645, at *6 (E.D.Ky. Dec.1, 2011).  The Sixth Circuit has held that an ALJ's failure to identify the reasons for discounting opinions, "and for explaining precisely how those reasons affected the weight" given "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Parks v. Social Sec. Admin.*, No. 09-6437, 2011 WL 867214, at *7 (6th Cir. March 15, 2011) (quoting *Rogers*, 486 F.3d at 243 ).

Here, the ALJ acknowledged that Dr. Pierce was Plaintiff's treating physician.  Tr. at 20.

-22-

He then attributed "little weight" to Dr. Pierce's opinions and offered three reasons for doing so. *Id.* The undersigned recommends that the Court find that the reasons offered by the ALJ are not sufficient to support the weight that he attributed to Dr. Pierce's opinions.

The ALJ first explained that he attributed "little weight" to Dr. Pierce's opinions because an opinion as to whether a claimant is disabled is a determination reserved for the ALJ. The ALJ is correct that such determinations are reserved for the ALJ and that a treating physician's opinions as to whether a claimant is unable to work are not entitled to any particular weight, although they may not be ignored. 20 C.F.R. §§ 404.1527(d) and 416.927(d).

However, the other reasons that the ALJ relied upon for the weight that he attributed to the rest of Dr. Pierce's opinions are insufficient. The ALJ discussed the possibilities that Dr. Pierce sympathized with Plaintiff when he completed the disability paperwork or that Plaintiff demanded that Dr. Pierce make such opinions. *Id.* Beyond speculation, the ALJ offered nothing in support of such allegations but thereafter cited to caselaw holding that a treating physician's opinions are entitled to substantial weight only if sufficient medical data supports such opinions. *Id.* He also cited to caselaw finding that an ALJ is not bound by a treating physician's opinion where substantial medical evidence exists to the contrary and great weight is accorded such opinions only when they are supported by clinical findings and are consistent with the record. *Id.* Again however, rather than point to the evidence in the record supporting the ALJ's recitation of the law, he merely concluded that his discussion of the medical evidence in a prior part of his decision showed that Plaintiff's abilities were greater than described by Dr. Pierce. *Id.*

Even retreating to his review of all of the evidence in the record, the ALJ discussed Plaintiff's fibromyalgia and treatment with Dr. Beeks. Tr. at 17. He noted Dr. Beeks' findings that Plaintiff met the tender points of the American College of Rheumatology and he noted rheumatologist Dr. Abusamieh's findings that Plaintiff had 12/18 of the ACR tender points, myalgia myositis, lumbosacral spondylosis without myelopathy, cervical spondylosis, low back lumbago and CTS. *Id.* The ALJ also noted that Plaintiff was prescribed Percocet for his pain and Morphine at one time as well. *Id.*

-23-

However, in finding that Plaintiff's impairments do not preclude his ability to perform light work with the handling and fingering restriction that he determined, the ALJ pointed to the conservative care that Plaintiff used to manage his impairments and the fact that Plaintiff was advised to go to a pain management clinic but did not do so. Tr. at 17-18. This explanation to the weight given to Dr. Pierce's opinions is insufficient. Plaintiff told his doctors that he could not go to pain management because he lost his health insurance and could not afford to go. *Id.* at 527, 551. And he cannot be faulted for participating in conservative treatment for his fibromyalgia because "more 'aggressive' treatment is not recommended for fibromyalgia patients." *Kalmbach v. Comm'r of Soc. Sec.*, No. 09-2076, 409 Fed. App'x 852, 864, 2011 WL 63602 at **11 (6th Cir. Jan. 7, 2011), unpublished. Plaintiff in this case participated in physical therapy with no relief, tried injections and has been prescribed many different pain medications.

Moreover, throughout his review of the medical evidence, the ALJ refers to "the objective medical evidence" and states that "[t]he evidence does not show significantly abnormal findings such as significantly limited range of motion, motor weakness, muscle atrophy, sensation loss, or reflex abnormalities that are genrially associated with intense and disabling pain." Tr. at 19. He also cited an absence of "sufficient objective findings to support the extensive limitations" that Dr. Pierce recommended. *Id*. However, fibromyalgia "is a medical condition marked by 'chronic diffuse widespread aching and stiffness of muscles and soft tissues.' " *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 244 n. 3 (6th Cir.2007) (quoting Stedman's Medical Dictionary for the Health Professions and Nursing at 541 (5th ed.2005)). Diagnosing fibromyalgia involves "observation of the characteristic tenderness in certain focal points, recognition of hallmark symptoms, and 'systematic' elimination of other diagnoses." *Rogers*, 486 F.3d at 244 (quoting *Preston v. Sec'y of Health & Human Servs.*, 854 F.2d 815, 820 (6th Cir.1988)). The Sixth Circuit has recognized that CT scans, X-rays, and minor abnormalities "are not highly relevant in diagnosing [fibromyalgia] or its severity." *Id.*; see also *Preston*, 854 F.2d at 820. "[P]hysical examinations will usually yield normal results – a full range of motion, no joint swelling, as well as normal muscle strength and neurological reactions. There are no objective tests which can conclusively confirm the disease; rather it is a process of diagnosis by exclusion". *Id.* at 818. Accordingly, "[o]pinions that focus

solely upon objective evidence are not particularly relevant" due to the "the unique evidentiary difficulties associated with the diagnosis and treatment of fibromyalgia." *Rogers*, 486 F.3d at 245.

Of course, there are instances where an ALJ's failure to comport with the treating source doctrine may be deemed harmless. A violation of the rule might constitute "harmless error" where (1) "a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it"; (2) "the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion"; or (3) "the Commissioner has met the goal of §1527(d)(2) – the provision of the procedural safeguard of reasons – even though [ ]he has not complied with the terms of the regulation." *Wilson*, 378 F.3d at 547. None of these exceptions apply here. Neither the ALJ nor the Commissioner claim that the treating physician's findings were patently deficient.

For these reasons, the undersigned recommends that the Court remand this case in order for the ALJ to reassess Dr. Pierce's opinions and, if rejected, offer a proper basis for the weight assigned to his opinions.  Accordingly, the undersigned recommends that the Court reverse the decision of the ALJ and remand this case for further analysis under the treating physician rule.

## B.  CREDIBILITY

Of equal concern, cases involving fibromyalgia "place[ ] a premium . . . on the assessment of the claimant's credibility." *Swain v. Comm'r of Soc. Sec.,* 297 F.Supp.2d 986, 990 (N.D. Ohio 2003).  This is because "unlike medical conditions that can be confirmed by objective testing, fibromyalgia patients present no objectively alarming signs." *Rogers*, 486 F.3d at 243. "Nonetheless, a diagnosis of fibromyalgia does not automatically entitle [a claimant] to disability benefits ...." *Vance v. Comm'r of Soc. Sec.*, 260 F. App'x 801, 806 (6th Cir.2008) (emphasis in original). Accordingly, in cases involving fibromyalgia an ALJ must assess Plaintiff's credibility[2]

---

[2]The Sixth Circuit has recognized that "disability claims related to fibromyalgia are related to the symptoms associated with the condition – including complaints of pain, stiffness, fatigue, and inability to concentrate– rather than the underlying condition itself." *Rogers*, 486 F.2d at 247, citing 20 C.F.R. § 419.929; *Wyatt v. Sec'y of Health & Human Servs*., 974 F.2d 680, 686 (6th Cir. 1992)(subjective complaints of pain may support a disability claim).  Further, "given the nature of fibromyalgia, where subjective complaints play an important role in the diagnosis and treatment of the condition, providing justification for discounting a claimant's statements is particularly important." *Rogers*, 486 F.2d at 248.

and "decide ... if the claimant's pain is so severe as to impose limitations rendering [him] disabled." *Swain*, 297 F.Supp.2d at 990.

Plaintiff contends that the ALJ erred when he did not credit Plaintiff's testimony regarding his debilitating pain.  When a disability determination that would be fully favorable to the plaintiff cannot be made solely on the basis of the objective medical evidence, an ALJ must analyze the credibility of the plaintiff, considering the plaintiff's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p. *See* SSR 96-7p, 61 Fed. Reg. 34483, 34484-34485 (1990).  These factors include: the claimant's daily activities; the location, duration, frequency and intensity of the pain; precipitating and aggravating factors; the type, dosage, effectiveness and side effects of any pain medication; any treatment, other than medication, that the claimant receives or has received to relieve the pain; and the opinions and statements of the claimant's doctors.  *Felisky*, 35 F.3d at 1039-40.

Since the ALJ has the opportunity to observe the claimant in person, a court reviewing the ALJ's conclusion about the claimant's credibility should accord great deference to that determination.  *See Casey*, 987 F.2d at 1234.  Nevertheless, an ALJ's assessment of a claimant's credibility must be supported by substantial evidence.  *Walters v. Commissioner of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997).

Here, the ALJ relied upon Plaintiff's activities of daily living to discredit his testimony regarding debilitating pain.  However, none of these activities suggest that he could perform full-time competitive work on a regular basis as required by SSR 96-8p.  *See also Rogers*, 486 F.3d at 248-249 (minimal daily functions not comparable to typical work activities).  While the ALJ cited to Plaintiff "chasing storms" and collecting bugs, Plaintiff testified at the hearing that he had to give up collecting bugs and he had no hobbies because of his impairments. Tr. at 19, 43.  The ALJ also cited to the conservative treatment that Plaintiff underwent, which included narcotic pain medications, injections and physical therapy. *Id.* at 19.  Once again, however, Plaintiff's pain, to the extent it was attributed to fibromyalgia, could not be addressed with surgery or more aggressive measures.  Moreover, Plaintiff was prescribed narcotic pain medications, and the ALJ failed to consider the adverse affects to Plaintiff's ability to concentrate.  Because the undersigned has

-26-

recommended remand  on the treating physician rule, and because credibility plays a more significant role where a claimant suffers from fibromyalgia, the undersigned also recommends that the ALJ reconsider his assessment of Plaintiff's credibility and if necessary, identify the substantial evidence in the record that supports his conclusion.

**VIII.**    **CONCLUSION**

For the foregoing reasons, the undersigned recommends that the Court REVERSE the ALJ's decision and REMAND the case to the ALJ for further analysis under the treating physician rule and

to reconsider his assessment of Plaintiff's credibility.

DATE: August 7, 2014

_____/s/George J. Limbert_____
GEORGE J. LIMBERT
UNITED STATES MAGISTRATE JUDGE

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this notice.  Fed. R. Civ. P. 72; L.R. 72.3.  Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).